[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This post judgment case was referred to the Regional Family Trial Docket by the Judicial District of Litchfield. It consists of the plaintiffs Motion for Modification dated August 5, 1999 #118). This motion addresses the plaintiff's desire to change the parenting plan incorporated in the judgment from one of shared joint physical and legal custody to one of sole custody in the plaintiff with visitation by the defendant on alternating weekends during the school year and more extensive visitation during school vacations. The defendant also filed a Motion to Modify dated August 5, 1999 (#117) but withdrew it orally at the commencement of the hearing. The plaintiffs motion was heard over six trial days. The court received testimony from the parties, the family services evaluator, the Guardian Ad Litem, and three other witnesses. Several exhibits were submitted as evidence.
The parties, Peggy Ann Jensen (Ms. Jensen) and Jeffrey S. Kelley (Mr. Kelley), were married for seven years and divorced on September 29, 1993. There are two children of the marriage: Dana Kelley born August 6, 1986 and Shelby Kelley born November 2, 1990. A separation agreement signed by both parties was incorporated into the judgment of the court (Pickett, J). That agreement provides, in part:
 "The parties will share custody of the minor children. The children will reside with the father from Sunday 9:00 a.m. to Wednesday 9:00 a.m. Every other weekend the father will have extended time beginning on Saturday 9:00 a.m. The children will reside with the mother the remainder of the week days and every other Saturday. Holidays, school and summer vacation periods will be shared and/or alternated per agreement of the parents."
Until sometime in 1996 the parties followed the parenting plan established at the time of the dissolution. Then, Mr. Kelley got a new job with a rotating schedule which made the plan impractical. So, the parties worked out an amended plan which called for Mr. Kelley to have the Children on whatever two days during the week that he was off from work, and every other weekend. his plan was followed until 1999 when Mr. Kelley lost his job and the parties went back to the original plan. On April 17, 2000 the parties agreed to a modification in the parenting plan which increased the length of Ms. Jensen's alternate weekend parenting time. This change was approved by the court without prejudice to either party in the argument of this motion to modify.
Both parties lived in Torrington at the time of the divorce. Mr. Kelley stayed in the marital home until November 1998 when a foreclosure forced CT Page 14107 him to move to an apartment on Butler Street in Torrington. This is near Barber Street where Ms. Jensen had been living since the divorce. In the [all of 1998 Ms. Jensen moved in with her boyfriend, Scott Saunders, at a two-family house he owned on Prescott Street in Torrington, also near Mr. Kelley's apartment. In the fall of 1999 Ms. Jensen moved to a new home in Barkhamsted with Mr. Saunders, now her fiance. Ms. Jensen and Mr. Saunders own this home jointly and live there with Mr. Saunders's two children, Brian, age 18, and Patrick, age 15.
When the children were younger and the parties both lived in Torrington, Ms. Jensen and Mr. Kelley were able to cooperate for the benefit of the children. Both children attended neighborhood schools in Torrington and did well in their studies. The parties were able to work through any disputes that arose regarding the children. Unfortunately, this spirit of cooperation evaporated in the spring of 1999 when Ms. Jensen and Mr. Saunders began construction of their Barkhamsted home, and Ms. Kelley's move to Barkhamsted became imminent. Barkhamsted is part of the Region 7 school district. Ms. Jensen told Mr. Kelley that she wanted to take full custody of the children and to enroll the children in Region 7 schools in the fall of 1999. Mr. Kelley objected. Since then the parties have become spiteful, petty and hardhearted toward each other. As a result, both have done things that are not in the best interests of the children. Much of the trial was consumed with the parties making a record of these various acts of pettiness and spite.
On June 8, 1999 Mr. Kelley made a complaint to the Torrington Police Department about Ms. Jensen after the parties had an argument at Mr. Kelley's apartment. Each party has a different version of this argument. The children had spent the day with their father and had gone to bed when Ms. Jensen called to discuss her plan to enroll the children in Region 7 schools. Mr. Kelley refused to agree with this plan. Ms. Jensen became enraged and verbally abusive. Mr. Kelley hung up. Within a few minutes Ms. Jensen showed up at Mr. Kelley's door in a rage. The parties continued their argument in the doorway. Ms. Jensen ended up forcing her way into the apartment. Mr. Kelley called the police. They did not arrive until after Ms. Jensen had already left. Ms. Jensen was not charged with an offense as a result of this incident.
Later that summer, on August 1, 1999, Ms. Jensen was supposed to deliver the children to Mr. Kelley in the morning. However, she notified Mr. Kelly that she was going to take the children to an amusement park that day and would not return them until that evening. Mr. Kelley objected to the children not being returned to him in accordance with the parenting plan. Ms. Jensen knew that she had no right to keep the children beyond the time specified in the court ordered parenting plan. She did it anyway. Mr. Kelly went to the Torrington Police Department to file a CT Page 14108 complaint. He was informed that it was a civil matter and would have to be handled in court. Ms. Kelley returned the children at about 6:00 p.m. that evening. Dana was not feeling well when he got to Mr. Kelley's house. Later that evening, Dana awoke with a bad headache. Mr. Kelley waited until morning and then got an appointment to see a doctor that day. The doctor diagnosed an ear infection and prescribed an antibiotic. Dana recovered quickly and did not require a follow up visit. As a result of this incident, Mr. Kelley reported to the Department of Children and Families that he believed that Ms. Jensen was guilty of medical neglect. None was found by DCF. There is no credible evidence that Ms. Jensen is guilty of neglect of the children in any way.
On August 4, 1999 Mr. Kelley refused to return the children to Ms. Jensen when his visitation was ended. Mr. Kelley knew that his action was in violation of the court ordered parenting plan. He did it anyway. Mr. Kelley testified that he refused to return the children because he was [earful about their safety. He denied that he was defying the authority of the court. However, there is no other way to construe his actions. The children were kept from their mother until August 11, 1999 following a court hearing. Ms. Jensen was unable to have contact with Dana on his birthday, August 6, 1999.
The principal issues presented in this case are: 1) Should the legal custody of the children be placed in the hands of Ms. Jensen? 2) Should the physical custody of the children be modified so that they would live solely with Ms. Jensen on all school-days? Intertwined with these issues is the question of whether Shelby should change schools from Vogel Whetmore School in Torrington where Mr. Kelley lives, to Barkhamsted Elementary School in Barkhamsted where Ms. Jensen lives.
Connecticut General Statutes, Section 46b-56 requires that the court's decision on a motion to modify a custody decree must be based on the best interests of the children. In order to prevail on a motion to modify custody, the moving party must prove by a preponderance, of the evidence, Cookson v. Cookson, 201 Conn. 229, 240 (1986), that there has been: ". . . a material change of circumstances which alters the court's finding of the best interests of the child or a finding that the custody order sought to be modified was not based upon the best interests of the child." Hall v. Hall, 186 Conn. 118, 122 (1982). Because the original custody order was based on the best interests of he child, the plaintiff is required to prove a material change in circumstances affecting the court's findings of the children's best interests. Not all changes in circumstances since the date of the judgment are material. Simons v.Simons, 172 Conn. 341, 344 (1977). Although a change in circumstances since the prior order of the court is required, the ultimate test is the best interests of he child. Brubeck v. Burns-Brubeck, 42 Conn. App. 583, CT Page 14109 585 (1996), citing Stewart v. Stewart, 177 Conn. 401, 407-408 (1979);Ireland v. Ireland, 246 Conn. 413, 430 (1998).
There is overwhelming evidence that there has been a material change of circumstances which alters the court's finding of the best interests of the children. This change consists of the total breakdown of the relatively harmonious relationship which existed between the parties for the first lye and one-half years following the dissolution of marriage. During this time the parties were able to co-parent as envisioned in the court-approved parenting plan. Now, their relationship has deteriorated to the point that they can no longer co-parent these children. This is such a shame because it is clear that each has been actively involved in raising two children who are well on their way to becoming well-adjusted, productive adults. The parents ought to be congratulating each other rather than running each other down. But, a state of war has existed between the parties for the past 18 months and there is no reasonable hope that it will end without a change in the parenting plan. If this war is allowed to continue it may begin to cause significant emotional upset to the children and erode all of the good which these parties were able to do when they acted civilly toward one another.
On August 5, 1999 both parties filed motions to modify the parenting plan. The court (Sheedy, J) requested that a full custody evaluation be conducted by Court Support Services. Julia Herbst Wholey, Family Relations Counselor, conducted the custody evaluation, wrote a full report and testified at length. In summary, she recommended that: 1) the parties continue to share joint custody; 2) the parenting plan during the school year be modified so that the children reside with Ms. Jensen during the week and attend school in Region 7; 3) Mr. Kelley exercise parenting time on alternating weekends and every Wednesday for dinner; and 4) when the children are not in school the parties will split the week as they do presently. Ms. Wholey's report is thorough and well documented. She found that the children love both parents and ". . . appear to be caught in the crossfire of these two highly conflicted adults." Ms. Wholey believes that, while both parents have some good parenting strengths, Mr. Kelley does not ". . . appear to be the parent who can provide the needed educational, academic or intellectual stimulation these two extremely bright children need." Ms. Wholey believes that Ms. Jensen is the ". . . parent who can provide the most stability, the most challenges and the economic advantages at this point."
Attorney Brian McCormick serves as Guardian Ad Litem for Shelby only. He made a careful review of all relevant factors affecting the best interests of Shelby. Attorney McCormick was called as a witness by Ms. Jensen and testified at length. At the end of the trial he testified again when called as a witness by the attorney for the minor children. CT Page 14110 Attorney McCormick believes that there are two major areas of conflict between the parties: 1) where Shelby will attend school, and 2) decision making in other areas. Attorney McCormick is of the opinion that it would be in Shelby's best interest to designate Ms. Jensen as the primary residential parent and to have Shelby go to school at Barkhamsted Elementary School. He feels that transferring Shelby to Barkhamsted Elementary School would reduce the driving that is required to get her to and from school. However, he feels that the parenting plan suggested by Ms. Wholey does not give Mr. Kelley sufficient time with the children. At first, Attorney McCormick suggested a plan which, during the school year would give Mr. Kelley an overnight with the children every Monday plus on alternating weekends. During school vacations he recommends an equal amount of parenting time to both parties. After hearing all of the testimony at trial, Attorney McCormick modified his recommendation so that Mr. Kelley would have the children on slightly fewer evenings during the school week. The attorney for the minor children submitted proposed orders which were endorsed by Attorney McCormick.
The plaintiff, Peggy Jensen, is 33 years of age. She was raised in Winsted. Although she did well in school, she dropped out of high school without graduating. She was 19 when she married Mr. Kelley. Ms. Jensen obtained her GED after their first child was born. In 1993 she began taking college courses at Northwest Community College in Winsted and obtained her associates degree as a legal assistant in 1996. She is employed as a legal assistant at a law firm in Canton. She is proud of her efforts to improve herself by going back to school as an adult. She wants her children to take advantage of all of the educational and extra-curricular opportunities that she gave up by quitting school and marrying young. Ms. Jensen believes that her organizational skills and enthusiasm for self-improvement make her a superior custodial parent for the children.
Ms. Jensen has a history of treatment for mental illness including a hospitalization when she was a teenager. She has periodically taken prescription medication as an adult to help her with emotional problems. While Ms. Jensen exhibits no signs of mental illness at this time, it is clear that Ms. Jensen has an explosive temper which, when activated, can cause her to be loud, sometimes in public places. She sometimes has boisterous arguments with her fiance which have been overheard by the children. Sometimes her anger has been directed toward Mr. Kelley and toward the children. But, there is no credible evidence that Ms. Jensen's temper has ever posed a danger to the children, either physically or emotionally.
Mr. Kelley is 35 years of age. He is in good health. Mr. Kelley is a graduate of the Gilbert School in Winsted where he was born and raised. CT Page 14111 He began a program in architectural drafting and design from Porter and Chester Institute but did not complete it. He is employed at Farrell Precision Metal Craft in New Milford as a machine operator. He has had several other jobs as a adult, most of which have been in factory work of one kind or another. There have been periods of unemployment during and after the marriage, some due to layoffs, some due to injury. Ms Jensen has attempted to show that Mr. Kelley has been irresponsible in maintaining employment, both during and after the dissolution. The court declines to make such a finding. Mr. Kelley's employment history, while not exemplary, is typical for a factory worker in northwestern Connecticut. In order to obtain employment, Mr. Kelley has taken jobs which require substantial driving to get to and from work. He has worked inconvenient shifts. Layoffs are an occupational hazard in factory work. Mr. Kelley has shown that he is a hard worker. If he is to be faulted for his work history, it should be because he has not followed through on his initial efforts to obtain additional education so that he could obtain better jobs.
Mr. Kelley has shown great perseverance in attempting to maintain a significant role in the lives of his children. His efforts have been beneficial to the children. In contrast to Ms. Jensen's activist approach to the management of every aspect of the children's lives, Mr. Kelley provides a calming, consistent influence. The children enjoy being in his company and participating in special activities which have become traditions: opening day of fishing season and Halloween are examples.
Ms. Jensen finds fault with Mr. Kelley on numerous grounds. She attempted to prove his irresponsibility by pointing out that he lost the marital home in foreclosure, that Shelby was frequently tardy at school a 4 years ago when she was in Mr. Kelly's care, that he canceled or missed several of Dana's dental appointments, that the children sometimes forget some of their things at Mr. Kelley's house, and that Mr. Kelley has not always been in attendance at the children's school events or extra-curricular activities. The court gives little weight to any of these complaints because all of them have plausible explanations.
Mr. Kelley is even more bitter in his attempts to belittle Ms. Jensen. He attempted to show that Ms. Jensen was physically and emotionally abusive, that she has neglected the children's medical care, that she "lost" the children in the country 3 or 4 years ago, and that she had loud arguments with someone in the front yard of her former apartment in Torrington. The court gives little weight to any of these complaints and wonders why Mr. Kelley ever agreed to joint custody at the time of the divorce if Ms. Jensen was as dangerous to the children as he now claims.
Of real concern to the court is the lack of communication between the CT Page 14112 parties. This has resulted in, for example, Shelby having four of her baby teeth removed by a dentist without the knowledge or consent of Ms. Jensen. Surgery was scheduled for Dana without Ms. Jensen's knowledge. Dana began taking pilot lessons without the knowledge and consent of Mr. Kelley. Finally, the breakdown in communications has resulted in the children having two pediatricians. It is intolerable that the children have "dueling doctors" because the parents are too uncommunicative to reach an agreement. A similar stalemate has existed regarding the choice of schools for the children. The parties have disagreed about where the children should go to school. Both parents have been pigheaded about this issue. In essence the children have had a choice about whether to attend schools in Torrington or in Regional School District 7. Fortunately, Dana's school choice was resolved in September 2000 when Dana made the decision that he wanted to go to Northwest Regional High School in Winsted. In an uncharacteristic display of unity, both parties supported his decision. But, they remain at loggerheads over Shelby's school. She continues to go to Vogel Whetmore Elementary School in Torrington which she has attended for the past several years. Ms. Jensen wants her to transfer to Barkhamsted Elementary School in Barkhamsted. Mr. Kelley objects; stalemate has ensued. Joint custody served the children well until 18 months ago. It no longer works because the parties can no longer put their hostilities aside for the benefit of their children. In spite to this deadlock, the court is reluctant to give one party total control of all decisions for fear that the other party will not be consulted again on any parental matters. For this reason, the court has decided to maintain joint legal custody but to grant one party the right to have the final word on decisions regarding the children if the parties can not reach an agreement. The court desires to have the children benefit from the input of both parents in the decision making process. Joint legal custody which provides for an ultimate decision maker allows for the input of both parents without the continued recurrence of deadlock. "We might determine that the award of custody in this case is the functional equivalent of an award of sole custody because the plaintiff has ultimate authority in all decisions regarding the children's welfare. (fn4) We reject this argument, however, because joint custody is the trial court's own determination of the meaning of its order." Tabackman v. Tabackman,25 Conn. App. 366, 368 (1991).
In determining which party is better able to make major parental decisions, including medical and educational decisions, the court has weighed many factors. Both parents have strong relationships with the children. But there are important factors which tip the scales in favor of Ms. Jensen. First, Ms. Jensen is at least somewhat less embittered than Mr. Kelley. She is willing to give Mr. Kelley some grudging credit for the role he has played in the lives of the children. Mr. Kelley is so hostile to Ms. Jensen that he is unwilling to give Ms. Jensen any credit CT Page 14113 for her contributions. He is unwilling to take any responsibility for the breakdown in communications. He [s less likely to consult Ms. Jensen than vice versa. Second, Mr. Kelley has demonstrated that he is willing to violate court orders if they do not meet his needs. He kept the children for 10 days in August 1999 in violation of the parenting plan. In violation of the parenting plan Mr. Kelley has [ailed to provide life insurance for the children since December, 1999. The court has more confidence that Ms. Jensen will abide by an order of the court that she must consult with Mr. Kelley on parental matters before making a final decision. The court is aware that the attorney for the minor children, the Guardian Ad Litem and the Family Relations Evaluator all recommended that joint custody be maintained without having a final decision-maker. The attorney for the minor children and the Guardian Ad Litem both suggested other methods of dispute resolution including mediation if parenting issues as well as having the GAL make a final decision on a pediatrician. Their recommendations have all been given serious consideration. However, these recommendations have been out-weighed by the evidence that the relationship between the parties has deteriorated so much that the only certain way to break the deadlock is to put one person in charge of major decisions if the parties are unable to reach agreement. On balance, Ms. Jensen is better able to handle this role.
Since Ms. Jensen will be designated as the primary decision-maker in the event of an inability to agree about educational issues, the court will assume that she will ultimately exercise her authority to enroll Shelby in school in Barkhamsted. But, the timing of the change of schools is an issue to be resolved. The attorney for the minor children and the Guardian Ad Litem have both recommended that the change be made after the Christmas vacation. Certainly this is preferable to having Shelby change schools now. But, it is a concern that Shelby would be leaving a school which she has attended for several years. She is a fifth-grader in a school which ends after fifth grade. In September of her sixth grade year Shelby will take the Connecticut Mastery Test again. The court is concerned that a change in her program in the middle of her academic year would not be in her best interest. There is no substantial reason why Shelby should not finish her school year at Vogel Whetmore School in Torrington. Then, the parties can try to reach agreement on her schooling for the 2000-2001 school year. If the parties are unable to reach agreement, Ms. Jensen will be able to make whatever decision she feels is best for Shelby.
The issue of the children's primary residence is more difficult to resolve. The parties truly dave shared residential custody. This has resulted in the development of healthy relationships between the parents and their children. But, there are two problems with the present schedule. First, when the children stay overnight with their father on a CT Page 14114 school night, Shelby has to get up at about 6:45 a.m. and travel with Dana and their paternal grandfather to Winsted to deliver Dana to school. Then, she and her grandfather travel back to Mr. Kelley's house in Torrington to wait until it its time [or Shelby to go to school at about 8:45 a.m. Her school is just a few blocks from Mr. Kelley's douse. The round trip to Winsted takes about 30 minutes. This happens either 2 or 3 times every week. When the children leave from their mother's house for school, Dana takes a school bus. Shelby is transported to school in Torrington by Ms. Jensen or her mother. This is a trip of about 25 minutes. If Shelby went to school in Barkhamsted, she could take a bus from her mother's house. It is Ms. Jensen's position that a great deal of travel, confusion and stress could be eliminated if Shelby lived with her during the week and went to school in Barkhamsted. If Shelby is enrolled in school in Barkhamsted, Shelby's traveling schedule will change somewhat on days that she stays with her father. Presumably, the children's grandfather would pick them up in time to bring Dana to school in Winsted. Shelby and her grandfather would then go to her grandfather's house in Winsted to wait until it was time to deliver Shelby to school in Barkhamsted.
There can be no doubt that life would be less complicated for Shelby if she lived solely with her mother during the week. But, the court is not convinced that the present schedule needs to be scrapped totally. The distances traveled by Shelby are not extreme. She might be able to sleep a bit Longer in the morning at her mother's house, but there is nothing harmful in having a child wake up at 6:45 a.m. Nor is it harmful to Shelby that she rides with her grandfather and with her brother to Winsted and back.
The second reason advanced in support of a change in the residence of the children during the school week is more of a concern. It is increasingly true that the children are having extracurricular activities which take place after school. Trying to coordinate these activities between two households leads to confusion, miscommunication, and acrimony between the parties. The children end up in the middle. There is some evidence that the children are beginning to use this confusion to avoid their responsibilities. Shelby never did her reading assigned for this past summer because her reading list became "lost" in her bookbag. Both parties blame the other for this happening. But a more reasonable explanation is that Shelby made use of the confusion caused by her schedule to conveniently forget to give the reading list to either parent. Dana missed his freshman orientation in September because he was staying with his father that evening and forgot to tell his father about it. Again, the parties are quick to assign blame to the other. But, the blame lies more with the lack of communication between them. This kind of mixup would be less likely to happen if one parent was responsible for CT Page 14115 the scheduling during the school week.
In spite of the two arguments discussed above, the court is convinced that the children profit from seeing their father in a role other than that of only a weekend parent. It would not be good for either child to see their father as uninvolved with their schooling. The children are used to seeing both of their parents wear more than one hat. It is important that this continue. The court feels that the first schedule proposed by the Guardian Ad Litem is a reasonable way to resolve these competing interests. This proposal will reduce the number of days that the children will spend with their father. This will reduce the travel for Shelby and some of the scheduling problems. However it retains some midweek overnights. Also, the court has decided to expand Mr. Kelley's summer access to the children as a way of making up for the time lost during the school year. Because both parents will continue to have extensive parenting time, neither parent will be designated as the primary residential parent.
The court finds that the following orders are in the best interests of the two minor children, Dana and Shelby:
1. The parties shall continue to share joint legal custody; however, when they have reached an impasse in decision making on matters pertaining to the children's education, medical and dental care, religious training, discipline, and moral values, Ms. Jensen shall be the final decision maker. Prior to making a final decision on these matter, Ms. Jensen must confer with Mr. Kelley and consider his opinions and recommendations with a view to arriving at a harmonious policy calculated to promote the best interests of the children.
2. The parties shall continue to share joint physical custody. The following schedule of parental access to the children is immediately ordered. The parties shall have parenting time on a two week schedule during the time the children are attending school:
Week One: Ms. Jensen will have the children on Monday until school begins, and then after school on Tuesday until school begins on Friday. Mr. Kelley will have the children after school on Monday until school starts on Tuesday, and then after school on Friday through Sunday.
Week Two: Mr. Kelley will have the children on Monday through the start of school on Tuesday morning. Ms. Jensen will have the children after school on Tuesday through the start of school on Monday morning of Week One (as shown on the attached schedule).
Each parent will be responsible for picking up the children for CT Page 14116 parenting time, and for the timely arrival of the children to school.
The holiday, vacation and birthday schedule shall override and supersede the basic parenting schedule.
During the summer school vacation, Mr. Kelley shall have parenting time with the children from the close of the last day of school until Friday of the following week at 7:00 p.m. Thereafter, the parties shall alternate weeks with the children with Ms. Jensen having the first week. The transitions shall take place on Fridays at 7:00 p.m. at the respective homes of the parties, with the parent whose week will begin on that Friday responsible for picking up the children. Any vacation activity, such as summer camp, shall be scheduled during the time the children are with the respective parent then having parenting time with the children.
In odd numbered years the children shall spend their school winter vacation with Mr. Kelley and their school spring vacation with Ms. Jensen. In even numbered years, the children shall spend their school winter vacation with Ms. Jensen and their school spring vacation with Mr. Kelley.
Neither parent will schedule activities for the children during the time the children are scheduled to be with the other parent without the advance agreement of the other parent. Ms. Jensen may, however, enroll the children in extracurricular activities which have occasional practices, events or games scheduled on weekends or on the nights the children spend with Mr. Kelley, and Mr. Kelley will accommodate the children's attendance. Activities, events, practices and games associated with the children's schools take precedence over parenting time of either party.
3. Holidays: The parties shall alternate the following holidays beginning in the year 2000:
Thanksgiving: in the year 2000 with Mr. Kelley, alternating thereafter:
Christmas Eve to Christmas Day at 11:30 a.m. in the year 2000 with Mr. Kelley, alternating hereafter:
Easter: in the year 2001 with the Ms. Jensen, alternating thereafter:
Father's Day: with Mr. Kelley each year:
Mother's Day: with Ms. Jensen each year. CT Page 14117
Opening day of fishing season: If the opening day of fishing season does not fall on one of Mr. Kelley's weekends with the children, he shall have the children from 6:00 p.m. on the day before opening day until 6:00 p.m. on opening day. Any other holidays shall follow the basic parenting schedule.
4. Each party shall be solely and individually responsible for obtaining information from the children's respective schools, including such matters as grades, schedules, conferences, etc.
5. Ms. Jensen shall obtain anger management training within the next 60 days.
6. Because the parties will continue to share physical custody of the children, neither party shall pay child support.
7. The parties shall each pay one-half of the reasonable fees and costs of Attorney J. Michael Sconyers, attorney for the minor children, and Attorney Brian T. McCormick, Guardian Ad Litem. Within 10 days from the date of this decision the Guardian Ad Litem and the attorney for the minor children shall submit to the court and other counsel their bills for fees and costs for their services in this case. The parties will have 10 days thereafter to file any written objections they may have to the reasonableness of these bills.
JOHN W. PICKARD JUDGE OF THE SUPERIOR COURT
 PARENTING SCHEDULE
 Mon. Tues. Wed. Thurs. Fri. Sat. Sun.
Week 1: Mom Dad Mom Mom Mom Dad Dad
 Dad Mom Dad Mom
Week 2: Dad Dad Mom Mom Mom Mom Mom
 Mom
Week 3: Mom Dad Mom Mom Mom Dad Dad
 Dad Mom Dad Mom
Week 4: Dad Dad Mom Mom Mom Mom Mom
 Mom